IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| L.M., Individually and as Guardian Ad Litem of A.K., an incompetent minor, | )   Civ. No. 05-00345 ACK/KSC<br>)<br>)<br>) |
|            Plaintiffs, | )<br>) |
|      v. | )<br>) |
| DEPARTMENT OF EDUCATION, STATE OF HAWAII, | )<br>)<br>) |
|            Defendant. | )<br>) |

ORDER AFFIRMING IN PART AND REMANDING IN PART THE HEARING OFFICER'S ADMINISTRATIVE DECISION

BACKGROUND

I.   Procedural Background

       This action arises from a claim made in an administrative proceeding pursuant to the Individuals with Disabilities in Education Act (the "IDEA"), 20 U.S.C. §§ 1400-1485 (2004).[1]  The IDEA was enacted by Congress to, among other things, "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to

_____

       [1]The IDEA was amended effective July 1, 2005, after the administrative hearing occurred in this case.  Therefore, the Court will refer to the prior version of the IDEA herein, unless otherwise noted.  See Lawrence Township Bd. of Educ. v. N.J., 417 F.3d 368, 370 (3d Cir. 2005) (amendments to the IDEA have prospective application only).

1

meet their unique needs . . . [and] to ensure that the rights of
children with disabilities and parents of such children are
protected." 20 U.S.C. §§ 1400(d)(1)(A) and (B) (2000). The IDEA
provides federal money to state and local education agencies to
assist them in educating disabled children, on the condition that
the state and local agencies implement the substantive and
procedural requirements of the IDEA. Robb v. Bethel Sch. Dist.
#403, 308 F.3d 1047, 1049 (9th Cir. 2002). The IDEA provides
procedural safeguards to permit parental involvement in all
matters concerning the child's educational program, including an
opportunity for an impartial due process hearing with respect to
complaints, and allows parents to obtain administrative and
judicial review of decisions they deem unsatisfactory or
inappropriate. Id.

On November 5, 2004, A.K. ("Student"), by and through
L.M. ("Grandmother") (collectively "Plaintiffs"), filed a Request
for Impartial Hearing with the Hawaii Department of Education
(the "DOE") under Hawaii Administrative Rules, Title 8, Chapter
56. Plaintiffs alleged that the DOE failed to provide Student
with a free appropriate public education (a "FAPE") as required
by the IDEA. 20 U.S.C. §§ 1400-1485. Administrative hearing
proceedings were conducted by a Hearing Officer in the Office of
Administrative Hearings of the Department of Commerce and
Consumer Affairs of the State of Hawaii. The administrative

proceedings culminated in the Hearing Officer's issuance of
Findings of Fact, Conclusions of Law and a Decision on April 25,
2005 (the "Administrative Decision").

On May 23, 2005, Plaintiffs filed a Complaint in this
Court appealing the Administrative Decision.  On December 14,
2005, the DOE filed a Motion to Dismiss Plaintiffs' Complaint on
the ground that Plaintiffs were not pursuing their claims in
accordance with the modified briefing schedule stipulated to on
August 28, 2005.  In response, Plaintiffs filed a Motion for
Sanctions pursuant to Federal Rule of Civil Procedure 11 on
February 15, 2006.  The Court denied both motions at a hearing on
March 6, 2006.

The Administrative Record was filed with the Court on
February 7, 2006.  The record contained the Transcript of the
Proceedings of the Administrative Hearing conducted from March 1
through March 3, 2005 ("Administrative Hearing Transcript"), the
Department of Education's Witness List and Exhibits 1-29
("Defendant's Exhibits"), Plaintiffs' Witness List and Exhibits
1-48 ("Plaintiffs' Exhibits"), and the Impartial Hearing Record.

The DOE filed a second Motion to Dismiss on April 21,
2006.  On April 24, 2006, Plaintiffs filed their Memorandum in
Support of Appeal ("Opening Brief") along with a Motion for
Extension of Time to File an Opening Brief.  Plaintiffs' motion
was referred to and heard by Magistrate Judge Chang on May 5,

2006.  Magistrate Judge Chang granted Plaintiffs' Motion to modify the briefing schedule and imposed sanctions on Plaintiffs, ordering the payment of reasonable attorney's fees, for failing to comply with the Court ordered deadline.  The DOE withdrew its April 21, 2006 Motion to Dismiss and filed Defendant's Responsive Brief ("Responsive Brief") in accordance with the modified briefing schedule on May 25, 2006.  Plaintiffs did not file a Reply Brief by the June 13, 2006 deadline.  Counsel for both parties confirmed that they waived oral arguments at the May 1, 2006 status conference before Judge Chang.

## II.   **The Administrative Decision**

In the Administrative Decision, the Hearing Officer dismissed Plaintiffs' claims for relief, finding (1) the DOE's offer of a FAPE at Salt Lake Elementary School (the "home school") was appropriate; (2) the DOE's plan to transition Student from Loveland Academy (hereafter "current school" or "Loveland") to the home school was adequate; and (3) no procedural violations resulted in a denial of a FAPE for Student. See Administrative Decision at 9-10.

Student is a minor inflicted with autism, mental retardation, and seizures.  Student attends and has been enrolled in Loveland, a small, private school, since 2000.  According to Grandmother, Student's current special education teacher, and Loveland's director, Student has made significant improvements

while at the current school.  <u>See</u> Administrative Decision at 3-4.
In contrast to Student's abilities prior to attending the current
school, Student has increased communication abilities and
improved physical, behavioral and functional life skills.
<u>See</u> Administrative Decision at 3-4.

Grandmother, staff from the current and home school,
therapists, and DOE representatives convened for an
individualized education program ("IEP") meeting on May 6, 2004.
The IEP team discussed Student's present levels of education
performance ("PLEPs"), goals, objectives, and the DOE's proposed
transition of Student from the current to the home school.  <u>Id.</u>
at 5.  Grandmother expressed her satisfaction with Student's
progress at the current school, her desire for Student to remain
at the current school, and her disapproval of the proposed
transition.  <u>Id.</u>

The IEP team developed a transition plan for Student
based in part on a transition plan developed for Student by
psychologist Dr. Margaret Koven, clinical director of the current
school, who testified at the administrative hearing as an expert
in developmental psychology.  <u>Id.</u>  While the DOE considered Dr.
Koven's plan when formulating Student's transition plan, Dr.
Koven did not approve of the final version of the transition plan
developed by the IEP team.  <u>Id.</u> at 5-6.

On May 18, 2004, the DOE formally notified Grandmother

through Prior Written Notice that the DOE would implement the
discussed IEP.  The DOE reviewed the factors considered during
the IEP meeting and itemized the services that would be offered
to Student at the home school.  Plaintiffs were dissatisfied with
the DOE's offer and submitted a Request for Impartial Hearing.
Plaintiffs asserted that no offer of a FAPE was made to Student
because the DOE did not comply with the substantive and
procedural requirements of the IDEA.

      Based on the Hearing Officer's findings of fact and
conclusions of law, the Administrative Decision ruled that the
DOE provided Student with an offer of a FAPE at the home school.
The Hearing Officer reasoned that the DOE's offer as set forth in
the IEP appeared to offer Student "meaningful educational
benefit."  See Administrative Decision at 8.  The proposed IEP
includes "special education, autism consultation, occupational
therapy [and] speech/language therapy" amongst other services.
Id.

      Additionally, the Hearing Officer expressed concern
with respect to the high possibility of Student's regression
during transition to the home school.  However, the Hearing
Officer concluded that the DOE's transition plan (which includes
progressive placement at the home school, consistent contact with
the current school, relationship building with staff of the home
school, and alternative arrangements if regression occurs)

adequately meets Student's gradual transition needs.  Id. at 9.

Finally, Plaintiffs asserted that the DOE committed procedural violations by ignoring Grandmother's and other professionals' input, giving deficient prior written notice, and unilaterally changing Student's placement.  The Hearing Officer concluded that no such procedural violations resulted in denial of a FAPE for Student.  The Hearing Officer declared that the evidence showed that the DOE made "great efforts" to involve multiple parties from the current and home schools, in addition to Grandmother, in considering Student's IEP.  See Administrative Decision at 9.  Furthermore, the Hearing Officer stated that the prior written notice sufficiently stated Student's needs.  Id. at 10.  Ultimately, the Hearing Officer ruled that none of the claims of procedural flaws resulted in "the loss of educational opportunity" or infringed upon Grandmother's "opportunity to participate in the IEP formulation process."  Id.  Therefore, he concluded that there were no procedural violations that resulted in a denial of a FAPE.  Id.

## **STANDARD**

In evaluating an appeal of an administrative decision under the IDEA, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as

the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)
(2006).[2]

This statutory requirement "that a reviewing court base
its decision on the 'preponderance of the evidence' is by no
means an invitation to the courts to substitute their own notions
of sound educational policy for those of the school authorities
which they review." Bd. of Educ. of the Hendrick Hudson Cent.
Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982). Rather, "due
weight" must be given to the findings in the administrative
proceedings. Id.

The amount of deference given to an administrative
hearing officer's findings is a matter of discretion for the
court. Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884,
891 (9th Cir. 1995) (quoting Gregory K. v. Longview Sch. Dist.,
811 F.2d 1307, 1311 (9th Cir. 1987)). The court must consider
the findings carefully and endeavor to respond to the hearing
officer's resolution of each material issue, but the court is
free to accept or reject the findings in part or in whole.
Capistrano, 59 F.3d at 891. When exercising its discretion to
determine what weight to give the hearing officer's findings, the
court may examine the thoroughness of those findings and accord

---

[2] Compare 20 U.S.C. § 1415(i)(2)(B) (in effect prior to
July 1, 2005) with 20 U.S.C. § 1415(i)(2)(C) (effective July 1,
2005). As the statute has remained substantially the same, the
Court's analysis on this issue is identical under either version
of the statute.

greater deference when the findings are "thorough and careful." Id.; see also Union Sch. Dist. v. Smith, 15 F.3d 1519, 1524 (9th Cir. 1994).

A court's inquiry in reviewing administrative decisions under the IDEA is twofold. "First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?  If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." Rowley, 458 U.S. at 206-207 (internal footnotes omitted); see also Smith, 15 F.3d at 1524.

## DISCUSSION

Plaintiffs ask this Court to reverse holdings of the Administrative Decision and rule that Student was denied an offer of a FAPE because of procedural and substantive violations of the IDEA.  Based on the alleged violations, Plaintiffs argue that the DOE unilaterally changed Student's placement when it discontinued paying for Student's educational services at Loveland in the Fall of 2004.  As a result, Plaintiffs request that this Court rule that Student's placement at the current school is appropriate, that Student's Skills Trainer hours be restored, and that Student's Grandmother receive retroactive and prospective reimbursement for Student's placement at the current school.

Finally, Plaintiffs request reasonable attorney's fees and costs. See Opening Brief at 33.   The Court addresses Plaintiffs' arguments in turn below.[3]

**I.   Consideration of the Procedural Requirements of the IDEA**

According to the Supreme Court, Congress placed equal emphasis on the importance of complying with the procedural and substantive requirements of the IDEA.   Rowley, 458 U.S. at 205. While not every procedural flaw signifies a denial of a FAPE, procedural inadequacies that cause a student to lose an educational opportunity or create an interference in the parents' opportunity to participate in formulating an IEP, result in the denial of a FAPE.   W.G. v. Board of Trustees of Target Range Sch. Dist., 960 F.2d 1479, 1484 (9th Cir. 1992).   Plaintiffs specifically allege the following procedural defects: (1) the DOE

_____

[3]   Plaintiffs have raised an issue regarding the burden of persuasion in light of a recent United States Supreme Court decision.   In Schaffer v. Weast, the Supreme Court held that the burden of persuasion at the administrative hearing is on the party seeking relief, which in this case would be the family. 126 S.Ct. 528, 531 (2005).   Prior to Schaffer, the Ninth Circuit held that the school district always has the burden of proving it complied with the IDEA at the administrative hearing and the party challenging the administrative decision has the burden at the district court.   Seattle School Dist., No. 1 v. B.S., 82 F.3d 1493, 1498 (9th Cir. 1996) (citing Clyde K. v. Puyallup Sch. Dist., 35 F.3d 1396, 1398-99 (9th Cir. 1994) (superceded by statute on other grounds)).   The Hearing Officer's decision was issued seven months before Schaffer, and there is no evidence in the Administrative Record or Administrative Decision that the Hearing Officer shifted the burden of persuasion onto the family. The Schaffer decision does not impact the rule governing the burden at the district court level.

improperly pre-determined Student's IEP without considering the input of Grandmother, Loveland personnel, and other independent evaluators; (2) the DOE failed to provide proper written notice; and (3) the DOE unilaterally changed Student's placement by refusing to pay for Student's education at Loveland in September 2004.

## A.   The DOE Did Not Predetermine A.K.'s Placement

It is unlawful to predetermine an IEP for a student without the input and participation of the student's guardian and/or teacher.  Target Range, 960 F.2d at 1484.  Plaintiffs contend that the DOE predetermined A.K.'s change of placement by failing to involve Grandmother and consider the opinions provided in independent assessments of Student.  Where a school district fails to conduct a "meaningful [IEP] meeting with appropriate parties" the procedural requirements of the IDEA are violated and no offer of a FAPE is made.  Id. at 1485.  However, the United States Court of Appeals for the Ninth Circuit held that no procedural violations occurred when a school district considered assessments by qualified individuals, observation, records, and input from parents in developing a student's IEP, even if it did not consider all the information from people knowledgeable about the student.  Park v. Anaheim Union High Sch. Dist., 444 F.3d 1149, 1155 (9th Cir. 2006).

11

### 1.    Parent/Guardian Involvement in Placement Decision

In 1975 Congress enacted the Education for All Handicapped Children Act, Pub. L. No. 94-142, 89 Stat. 775 (1975)(codified with subsequent amendments at 20 U.S.C. §§ 1401-1485 ("EAHCA").  In 1990, the EAHCA was amended to change the title of the act to the IDEA.  20 U.S.C. §§ 1400-1485.  Although a number of amendments have been made to the IDEA, many of the substantive goals of the EAHCA remain in today's IDEA.

The IDEA requires that "the parents of each child are members of any group that makes decisions on the educational placement of their child."  34 C.F.R. § 300.501(c).  Specifically, the Act requires that the parents of the child with a disability be a part of the IEP team.  20 U.S.C. § 1414(d)(1)(B).  Previously, the Supreme Court recognized that parental involvement was an important element of the former EAHCA.  Burlington Sch. Comm. v. DOE, 471 U.S. 359, 368 (1985).  The Supreme Court noted that in developing an IEP consensus would likely not always be reached between school officials and parents.  Id.  When a consensus is not reached, the Ninth Circuit has declared that "the [DOE] has the duty to formulate the [IEP] to the best of its ability in accordance with information developed at the prior IEP meetings, but must afford the parents a due process hearing in regard to that plan."  DOE v. Maher, 793 F.2d 1470, 1490 (9th Cir. 1986).

12

The IDEA does not explicitly vest within parents a power to veto any proposal or determination made by the school district or IEP team regarding a change in the student's placement. Id. at 1489. Rather, the IDEA requires that parents be afforded an opportunity to participate in the IEP process and requires the IEP team to consider parental suggestions. See e.g., McGovern v. Howard County Pub. Sch., No. AMD 01-527, 2001 U.S. Dist. LEXIS 13910 at *55-56 (D. Md. Sept. 6, 2001).[4] The McGovern court held that when a parent's suggestions pertaining to a child's placement are not accepted and incorporated into the IEP that does not necessarily constitute an IDEA violation. Id. The court further concluded that the parents were not denied significant input in their child's IEP when there was frequent contact between parents and school staff, the parents actively participated in IEP meetings, and the parents' suggestions were taken seriously by the IEP team but were not implemented in the final IEP. Id. at 56.

In this case, the DOE convened the first IEP meeting on March 31, 2003 to create an appropriate IEP for Student. See Administrative Hearing Transcript at 44:10. The IEP team convened approximately seven times over the next fourteen months. Id. at 19. Grandmother was present at these meetings and was an

---

[4] The Court finds this unpublished decision to be illustrative, although it is not relying on it as precedent.

13

active participant.  Id.  Grandmother was present at the final IEP team meeting on May 6, 2004, and she received a copy of the IEP along with a Prior Written Notice form on May 18, 2004.  It is clear from the record that Grandmother provided comments pertaining to Student's IEP at the May 2004 IEP meeting.  See Administrative Hearing Transcript at 372-73.  Furthermore, Grandmother admitted that the IEP was altered at one time in order to better fit her and Student's needs.  Id. at 376.  While Grandmother may not have been in agreement with the new placement and IEP, there is sufficient evidence to support the Hearing Officer's conclusion that Grandmother was involved and her input was properly considered throughout the process.  See Administrative Decision at 9.

### 2.    Consideration of Evaluations Made by Persons Knowledgeable about Student

A number of procedural safeguards exist to ensure that a student's IEP is formulated in part by individuals with specific knowledge of the student.  First, a student's placement decision is to be made by a group of persons knowledgeable about the student and by taking into account evaluation data and placement options.  34 C.F.R. § 300.552.  Second, if a parent obtains an independent educational evaluation at private expense, that evaluation must be considered by the public agency in any decision pertaining to the student's FAPE.  34 C.F.R. §

14

300.502(c).

When a student's IEP was composed by supplementing the goals of the student's mother and physician with the goals of the district, no procedural violations occurred.  Park, 444 F.3d at 1155.  However, when a school district implemented an IEP that was composed without taking into account the recommendations of persons "most knowledgeable" about the student, including the student's teachers and doctors, the IEP was not "reasonably calculated to enable [the] child to receive education benefits." Target Range, 960 F.2d at 1484.

In Target Range, the school district failed to incorporate persons with knowledge of the student in the IEP process when the district presented an IEP for the student.  Id. Objections to the IEP made by the student's parents were disregarded, no alternatives to the IEP were discussed, and no members of the student's current school participated in developing the IEP.  Id. at 1481-1482, 1484.  Similarly, another court held that a school district did not comply with procedural requirements of the IDEA when the recommendations of persons knowledgeable about the student were not given serious consideration.  Taylor v. Copake-Taconic Hills Cent. Sch. Dist., 649 F. Supp. 1253, 1255 (N.D.N.Y. 1986).  In Taylor, the school district recommended a change in placement for a student that was rejected by the student's parents, his family care provider,

15

personal doctor, orthopedist, and prior classroom teacher.  Id. at 1256-57.

Jennifer Garvey, Special Education Teacher at Salt Lake Elementary School, explained that the May 2004 IEP was the result of 14 months of collaboration between the DOE, the family, and the staff of Loveland.  See Administrative Hearing Transcript at 32.  Commencing March 31, 2003, the IEP team met approximately seven times to develop an appropriate IEP for Student, with members of Loveland's staff present at the majority of the meetings.  Garvey explained that personnel from the two schools collaborated to present and mesh their goals and objectives.  Id. at 34:11-23.  Garvey also testified that she had an opportunity to observe Student in her Loveland environment.  Id. at 35.  It is clear that persons with knowledge of Student were present at all of the IEP meetings.  See Plaintiffs' Exhibits at 29-41.

The evaluations and recommendations of a number of additional professionals with knowledge of Student were also considered.  Dr. Robert Bart, Jr. performed neurological evaluations of Student; Dr. Margaret Koven, director at Loveland, produced a comprehensive psychological and developmental evaluation of Student; and Dr. Bryna Siegel performed a psycho-educational assessment of Student.  Plaintiffs allege that the evaluations of Dr. Koven and Dr. Bart were "not properly considered" by the IEP team.  See Opening Brief at 20.

Dr. Bart began assessing Student in February of 2002.
On February 20, 2002, Dr. Bart commented that "[A.K.] seems to be
making progress at Loveland Academy, although how much of this is
due to Loveland, and how much of this is due to the efforts of
her Grandmother, is unclear at this time." See Plaintiffs'
Exhibits at 3.3.  Based on the documents provided the Court, it
does not appear that Dr. Bart attended any IEP meetings; however,
Dr. Bart's liaison, Charles Neuman, was in attendance when
Student's transition was discussed.  Id. at 31.3.  Mr. Neuman
commented with regard to Dr. Bart's medical evaluation of
Student, but not with regard to Dr. Bart's recommendations for
Student's educational placement.  Id.

On November 8, 2004, after the DOE offered Student a
FAPE at the home school, Dr. Bart composed a letter addressing
Student's educational placement.  Dr. Bart stated that he
believed three factors to be important in Student's educational
environment: (1) Student should have a one-on-one caretaker; (2)
Student's classroom should ensure Student's safety; and (3)
Student's classmates safety should be ensured against Student's
possible aggressiveness.  Id. at 3.1.  Dr. Bart concluded that
Student's current placement was providing for her needs, and that
based on his experience, no DOE school would suffice.  Id.

Dr. Bart did not claim to have visited any DOE campuses
and did not specifically address the suggested placement at the

17

home school.  Id. at 3.1.  Although Dr. Bart expressed his

skepticism regarding the DOE's ability to provide adequate care

and facilities for Student only after an offer of a FAPE was made

to Student, the Court finds that Dr. Bart's concerns are

adequately addressed by Student's current IEP (Student will be

provided a one-on-one caretaker at the home school and measures

have been taken to assure that Student's transition is made

safely).  See Administrative Hearing Transcript at 40:13-25,

50:5-13, 51:8-19.

        Dr. Koven, Plaintiff's expert and Director of Loveland,

composed a number of reports detailing Student's psychological

assessment in 2000 and 2001.  On May 12, 2003, Dr. Koven drafted

a transition plan for Student that discussed Student's

educational status, markers for Student's readiness to

transition, characteristics of a new placement and steps for

Student's transition.  See Plaintiffs' Exhibits at 32.13-32.15.

Dr. Koven testified that she "brought [the transition plan] to

the IEP meetings in the hopes that DOE would look at it and

incorporate it and add their own steps and their own concerns to

it."  See Administrative Hearing Transcript at 442.  Dr. Koven

did not attend the final IEP meeting on May 6, 2004, but two

members of her staff from Loveland, including Student's special

education teacher John Dreher, were present.  Plaintiff's

Exhibits at 29.13.  Furthermore, Dr. Koven's recommendations and

reports were often discussed during the IEP meetings according to meeting notes.  See Plaintiffs' Exhibits at 29-35.

Although Dr. Koven believes that the DOE's proposed transition plan is "significantly different" from the plan she composed, the Court finds that Dr. Koven's recommendations were sufficiently considered and reviewed during the IEP process.  See Administrative Hearing Transcript at 443:4-6.  Dr. Koven's transition plan was used as a "framework" when Student's transition plan was drafted, Dr. Koven's assessments and transition plan were discussed at numerous IEP meetings, and Loveland staff input was considered when the transition plan was proposed to the IEP team.  Id. at 46:23-25, 47:1-3, Plaintiffs' Exhibits at 29.16, 29.2, 32.10-32.11, 32.19, 32.28.

In 2002, the DOE contacted Dr. Siegel and requested she perform an independent assessment of Student to determine whether the DOE could offer Student an alternate appropriate placement.  See Administrative Hearing Transcript at 208-09.  At that time, Dr. Siegel met with and tested Student, met with Dr. Koven to discuss Loveland's program, and visited the alternate recommended placement.  After her review, Dr. Siegel recommended that Student remain at Loveland.  Id. at 209.

The DOE contacted Dr. Siegel again in 2004 to conduct another independent assessment of Student.  However, Dr. Siegel was unable to meet with or observe Student because Loveland did

not consent to Dr. Siegel's evaluation.  Id. at 214:13-25.
Nonetheless, based on her assessment of Student in 2002,
Student's subsequent records, and a review of the program and
teacher at Salt Lake Elementary, Dr. Siegel composed an
independent assessment of Student.  Id. at 216:22-25.  Although
Dr. Siegel did not base her recommendation on her observation of
Student, Dr. Siegel had the opportunity to peripherally observe
Student at Loveland while assessing another Student.  See
Administrative Hearing Transcript at 215.  It appears that this
observation did not in any way alter her proposed
recommendations.  Dr. Siegel testified that Student is ready for
a transition away from pre-academics, Student has shown "very
minimal progress" while at Loveland, and that it is time to "try
different strategies" in Student's education.  Id. at 221:23-24,
225:11-13, 18.

        Plaintiffs assert that Dr. Siegel should not have been
allowed as an expert witness in this case.  Id. at 187.
Specifically, Plaintiffs argue that Dr. Siegel's assessment of
Student and expert testimony should be ignored because she is not
a licensed clinical psychologist in Hawaii and any psychological
assessment of Student was therefore done illegally.  See H.R.S. §
465-2 (making it unlawful to practice psychology in Hawaii
without a license); Administrative Hearing Transcript at 185-89.
The Hearing Officer denied Plaintiffs' objections on both

grounds.  Dr. Siegel admitted that she is not a licensed clinical psychologist in Hawaii, and stated that she does not consider herself a clinical psychologist.  Id. at 185.   However, the Hearing Officer found Dr. Siegel is qualified as an expert in educational psychology based on her "qualifications and experience . . . not on her licensing status."[5]   Id. at 188-89.  The Court concludes, in accordance with the Hearing Officer's assessment, that Dr. Siegel, a Professor of Psychiatry and Director of the Autism Clinic at the University of California, San Francisco, is qualified to testify as an expert in the field of educational psychology based on her educational background, publications, former and current positions, and experience in the field.  See Administrative Hearing Transcript at 149-59.[6]

Plaintiffs also attempted to discredit Dr. Siegel by introducing testimony from Kenneth Pomeranz, a Chancellor Professor of History and Professor of East Asian Language and Literature at the University of California at Irvine.  See id. at

---

[5]  Furthermore, Hawaii law permits expert testimony by psychologists that are not licensed.  H.R.S. § 465-3(d).

[6]  Plaintiffs offer no evidentiary rule or legal basis to strike expert testimony based on a psychological assessment of a student performed by a person who is not licensed in Hawaii.  The actual performance of the assessment may not have been conducted pursuant to Hawaii licensing laws, but that does not alter the witness's qualifications or ability to provide testimony in the field of her expertise.  Furthermore, Dr. Siegel provided an evaluation of Student in 2002, deeming Loveland to be an appropriate placement for Student, to which Plaintiffs voiced no objection.

481-504.  Pomeranz testified that he had concluded that Dr.
Siegel and a co-author had used flawed data and deleted
unfavorable data in an article published on autism in 1998.  Id.
at 487-88.  Dr. Seigel testified on rebuttal, to the satisfaction
of the Hearing Officer, that the editors of the publication may
have edited her article.  The Hearing Officer was not persuaded
by Pomeranz' testimony and found Dr. Seigel to be credible.
Administrative Decision at 7.  The Court finds no basis to reach
a contradictory conclusion, especially considering the fact that
the Hearings Officer had the benefit of being present during the
witnesses' testimony.

Members of the family, the current school, home school,
the Department of Education, and independent evaluators
collaborated to prepare an appropriate IEP for Student over
fourteen months.  The IEP developers and parties to this appeal
may not have reached a complete consensus on each element of
Student's IEP and transition plan, but there is substantial
evidence that the DOE considered an expansive set of opinions,
input, and independent evaluations.  Thus, the Court finds no
evidence of procedural defects in the DOE's development of
Student's IEP.

**B.   The DOE Provided Adequate Prior Written Notice**

Before a school district may alter the educational
placement of a student, the school district must first provide

notice to the student's parents in writing.  20 U.S.C. §
1415(b)(3)(A).[7]  The requirement of providing parents with formal,
written notice of changes in the student's placement is strictly
enforced.  Smith, 15 F.3d at 1526.  The purpose of the notice
requirement is to ensure that parents may decide whether the
proposed placement will provide an appropriate education for
their child.  Smith v. Squillacote, 800 F. Supp. 993, 998 (D.

---

[7]  The notice required by subsection (b)(3) of this section
shall include-

> **(1)** a description of the action proposed or refused by
> the agency;
>
> **(2)** an explanation of why the agency proposes or
> refuses to take the action;
>
> **(3)** a description of any other options that the agency
> considered and the reasons why those options were
> rejected;
> **(4)** a description of each evaluation procedure, test,
> record, or report the agency used as a basis for the
> proposed or refused action;
>
> **(5)** a description of any other factors that are
> relevant to the agency's proposal or refusal;
>
> **(6)** a statement that the parents of a child with a
> disability have protection under the procedural
> safeguards of this subchapter and, if this notice is
> not an initial referral for evaluation, the means by
> which a copy of a description of the procedural
> safeguards can be obtained; and
>
> **(7)** sources for parents to contact to obtain assistance
> in understanding the provisions of this subchapter.

20 U.S.C. § 1415(c).

D.C. 1992).   In order for parents to have the opportunity to make such a decision, the prior written notice must contain information pertaining to the program proposed and the reasons for the proposed change.   Id.   In the past, courts have deemed prior written notice procedurally adequate when it stated the reason for the proposed change as being that a public school could offer student a FAPE in place of the current private school.   Id. at 999; see also B.V. v. DOE, No. 05-00116 U.S. Dist. 2005 WL 3674965, at *12 (D. Haw. 2005).

Plaintiffs argue that the Prior Written Notice informing Grandmother of Student's change in placement from the current school to the home school was deficient and therefore denied Student a FAPE.   Specifically, Plaintiffs assert that the Prior Written Notice did not "thoroughly identify or discuss alternatives or assessments considered by DOE."   See Opening Brief at 21.   Furthermore, Plaintiffs allege that the Prior Written Notice is inadequate because it does not set forth the DOE's reasons for the proposed change in placement.   Id. at 28. The Hearing Officer found that "the prior written notice states that Student's need for individualized, systematic instruction and supervision can be appropriately addressed through the proposed IEP at the home school."   See Administrative Decision at 10.

The DOE prepared a Prior Written Notice of Department

24

Action form that follows the exact structure of Section 1415 of the IDEA and contains all the of the required elements.  <u>See</u> Plaintiffs' Exhibits at 29.2.  The DOE provided Grandmother with a complete Prior Written Notice of Department Action of its decision to offer a FAPE to A.K. at Salt Lake Elementary on May 18, 2004.  <u>Id.</u>  The Prior Written Notice provides an explanation of the proposed action and explains that the IEP considered maintaining Student's current placement as an alternative.  The Court concludes, in agreement with the Hearing Officer, that the DOE satisfied its responsibility of providing written notice to Grandmother.

**C.   The DOE's Termination of Services in September 2004 was not a Unilateral Change of Placement**

There were two distinct elements of Student's educational program in effect prior to September 2004.  Student received education services at Loveland Academy during the regular school day and in an after school program. Administrative Hearing Transcript at 292:13-16.  In addition, she received 20 hours of Skills Trainer services on nights and weekends each week, which were provided by individuals from other agencies.  <u>Id.</u> at 292:17-21; 376:4-5.

As a result of the May 6, 2004 IEP, the DOE concluded that it could offer a FAPE to A.K. at Salt Lake Elementary.  From the outset, Grandmother objected to the May 2004 IEP.  As a

result, she elected to keep Student enrolled at Loveland in the Fall of 2004.  The DOE discontinued payment for Student's education services as it considered Grandmother's decision to keep Student at Loveland to be a unilateral placement.  Loveland continued to provide regular school and after school services at no cost to Plaintiffs, but Student's Skills Trainer evening and weekend services, which were provided by other agencies, were terminated.  Grandmother filed a Request for Impartial Hearing on November 5, 2004 invoking the "stay put" provision of the IDEA. Impartial Hearing Record, Ex. 1 at 3.

Plaintiffs argue that Defendant unilaterally changed Student's placement when it discontinued payment for Student's educational program in September 2004.  As the Court has concluded that the DOE satisfied the procedural requirements of the IDEA in including Grandmother's input, considering external evaluations, and providing proper written notice, there is no procedural basis for Plaintiffs' claim that an improper, unilateral change of placement took place.

**D.    The DOE May Have Violated the "Stay Put" Provision**

Plaintiffs also allege that Defendant violated 20 U.S.C. § 1415(j), known as the "stay put" provision.[8]  The purpose

---

[8]     Except as provided in subsection (k)(4) of this section, during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise

**(Cont.)**

of Section 1415(j)'s "stay put" provision is typically to
maintain the current educational placement described in the
child's most recently agreed upon IEP.   Johnson v. Special Educ.
Hearing Office, State of Cal., 287 F.3d 1176, 1180 (9th Cir.
2002) (citing Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618,
625-26 (6th Cir. 1990) ("status quo . . . refers to the operative
placement actually functioning at the time the dispute first
arises.")); Drinker v. Colonial School Dist., 78 F.3d 859, 867
(6th Cir. 1996); see also 1 Bonnie P. Tucker & Bruce A.
Goldstein, Legal Rights of Persons with Disabilities: An Analysis
of Federal Law 14:46-47 (1992) (status quo is "the last
uncontested status that preceded the controversy").

        There appear to be three issues, critical to the "stay
put" analysis, that the Court can not wholly resolve based on the
Administrative Record and briefs submitted to this Court.   The
evidence is insufficient to properly determine (1) the nature of
the "current educational placement"; (2) whether the "current
educational placement" was properly maintained; and (3) whether
any modifications to the "current educational plan" amount to a
"change in placement."   In light of the scarcity of evidence, the

_____

                agree, the child shall remain in the then-current
                educational placement of the child, or, if applying fo
                initial admission to a public school, shall, with the
                consent of the parents, be placed in the public school
                program until all such proceedings have been completed.

20 U.S.C. § 1415(j); see also 34 C.F.R. § 300.514.

Court remands to the Hearing Officer to determine whether the DOE violated the "stay put" provision.   The Court briefly outlines the unsettled issues in order to aid the Hearing Officer's assessment.

> **1.   Current Educational Placement**

"The [stay put] provision represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved."   Susquenita School Dist. v. Raelee S., 96 F.3d 78, 82 (3d Cir. 1996) (citing Drinker, 78 F.3d at 864-65).   In Thomas, the Sixth Circuit recognized that the "current educational placement" relevant to the "stay put" provision may be different depending on whether the new IEP has actually been implemented.   918 F.2d at 626.   When the new IEP has not been implemented, the court held that the "current educational placement" under which the child was receiving instruction when the dispute arose was operative.   Id.   However, if the new IEP actually took effect, then the school must maintain that placement throughout the course of the proceedings. Id.

Here, there is no dispute that the May 2004 IEP was never implemented, so the "current educational plan" is that which was in effect when the dispute arose.   Grandmother objected

to the May 2004 IEP from the outset.  Her objection is evident from her decision to keep Student at Loveland in September 2004.  Grandmother did not file her Request for Impartial Hearing until the beginning of November 2004.  The Hearing Officer is instructed to determine exactly when the dispute arose in the "stay put" context and what was the exact nature of the "current educational plan" at that time.  He should consider why Grandmother delayed filing her request for an impartial hearing for almost six months after her initial objections and whether this delay should have any effect on the respective rights of the parties.  In addition, the Hearing Officer should consider whether Grandmother's decision to enroll Student at Loveland in September 2004 without maintaining night and weekend Skills Trainer services impacts the rights afforded under the "stay put" provision.

### 2.    Implementation

The determination regarding the exact components of the "current educational placement" will impact whether the placement was properly implemented.  The DOE resumed payment of Student's Loveland costs as soon as Grandmother filed her impartial hearing request.  However, there is some evidence that the night and weekend Skills Trainer services were not resumed until late December 2004.  Dr. Patricia Dukes, Speech Pathologist and owner of Loveland, testified that the outside Skills Trainers that

worked with Student at night and on weekends were suspended from approximately September 6, 2004 through the end of December 2004. See Administrative Hearing Transcript at 292:1-23.  In addition, Plaintiff's witnesses John Dreher, Marsha Ho, and Grandmother testified regarding the interruption of Skills Trainer services that occurred from September 2004 through December 2004.  Id. at 340:15-17; 352:18-22; 367:21-24.

Defendant represents to the Court that it "restored services when Grandmother submitted her Request for Impartial Hearing." See Responsive Brief at 14 n. 10.  This contention does not specify what services were restored or when they were restored.  Accordingly, if the Hearing Officer determines that the night and weekend Skills Trainer services were a component of the "current educational plan," then he must also examine whether the DOE failed to provide in a timely manner those services at any point after Grandmother's impartial hearing request.

### 3. Change in Educational Placement

"The term 'change in educational placement' should be given an expansive reading, at least where changes affecting only an individual child's program are at issue." DeLeon v. Susquehanna Community School District, 747 F.2d 149, 153 (3d Cir. 1984).  Courts identify a change in placement if the adjustment in services is "likely to affect in some significant way the child's learning experience." Id.; see also Tucker, Legal Rights

of Persons with Disabilities: An Analysis of Federal Law at 14:52-53 ("It has been held that a change in program that will substantially or significantly affect the programs and services being provided to the child constitutes a change in placement.").[9]

The record appears to indicate that Student lost a substantial component of her educational program when the 20 hours a week of Skills Trainer services were suspended. As a result, Student's witnesses testified that Student suffered regression and physical discomfort in the form of hives, and exhibited behavior problems. Administrative Hearing Transcript at 292:23-292:16; 340:15-17; 352:18-22; 367:21-24. It is unclear to what extent this adverse impact occurred before Grandmother's request for the hearing and how much was a result of the services not being restored immediately after November 5, 2004, and whether such delay constitutes a "change in placement."

In conclusion, the Court holds that the DOE complied with the majority of the procedural safeguards of the IDEA. The

---

[9] Citing <u>Hale v. Poplar Bluff R-1 School District</u>, 280 F.3d 831, 833 (8th Cir. 2002) (eliminating home school services and offering public school placement constituted a change in placement); <u>Brent v. San Diego Unified School District</u>, 25 IDELR 1 (S.D. Cal. 1996) (where discontinuation of transport to and from summer day treatment programs pending a due process hearing violated the "stay put" provision); <u>Gebhart v. Ambach</u>, 1982-83 EHLR 554:130 (W.D.N.Y. 1982) (reduction from 12-month program to 10-month program was of sufficient magnitude to constitute a change of placement); <u>Sherry v. New York State Educational Department</u>, 497 F. Supp. 1328, 1337-38 (W.D.N.Y. 1979) (indefinite suspension of student was a change in educational placement).

DOE included Grandmother in the IEP development process, considered the input of external professionals and Loveland personnel, and provided proper prior written notice.  The Court also holds that the DOE did not make a unilateral change of placement in September 2004 when it suspended payment for Student's educational services at Loveland.  Finally, the DOE may have violated the "stay put" provision by failing to resume payment for Student's night and weekend Skills Trainer services from November 5, 2004 through the end of December 2004.  For this reason and pursuant to its instructions, the Court remands to the Office of Administrative Hearings of the Department of Commerce and Consumer Affairs of the State of Hawaii for the purpose of determining whether the DOE violated 20 U.S.C. § 1415(j) of the IDEA.  The Court will now consider the alleged substantive defects in the DOE's offer of a FAPE to Student.

## II.  <u>Consideration of the Substantive Requirements of the IDEA</u>

The IDEA requires that individuals with disabilities be offered a FAPE that emphasizes special education, is designed to meet the unique needs of the student, and will prepare the student for further education, independent living and employment. 20 U.S.C. § 1400(d)(1).  An education is appropriate if it "(1) addresses [the student's] unique needs; (2) provides adequate support services so [the student] can take advantage of the educational opportunities; and (3) is in accord with the

individualized education program." <u>Capistrano</u>, 59 F.3d at 884, 893; <u>see also</u> <u>Rowley</u>, 458 U.S. at 188-89.  An appropriate education "does not mean the absolutely best or 'potential-maximizing' education for the individual child.  <u>Gregory K.</u>, 811 F.2d at 1314.  Rather, the state must only provide "a basic floor of opportunity" for the student.  <u>Id.</u>  Furthermore, although a family's preferred schooling may be more beneficial for the student than the DOE's proposed placement, this alone does not make the DOE's placement inappropriate.  <u>Gregory K.</u>, 811 F.2d at 1314.

Plaintiffs assert that the DOE has substantively violated the IDEA.  First, Plaintiffs argue that the DOE has violated IDEA provisions by changing Student's placement from the current school to the home school.  <u>See</u> Opening Brief at 25. Plaintiffs argue that a change in placement would "deny [Student] the program required by her unique needs."  <u>Id.</u>  Second, Plaintiffs assert that the DOE has failed to create an adequate transition plan for Student.  <u>Id.</u>

## A.   Change in Student's Placement is Appropriate

An IEP was composed for Student over a fourteen month development process culminating at the May 6, 2004 meeting, and offered to her through Prior Written Notice on May 18, 2004.  In contrast to Student's previous placement, the IEP at issue offered Student placement at a public school, rather than at the

33

current private school she is attending.  Plaintiffs assert that the change in Student's placement is "inconsistent with [Student's] needs."  See Opening Brief at 25.

The services offered Student in the May 6, 2004 IEP are as follows: (1) occupational therapy (150 minutes/week); (2) SBBH Autism Consultation (1500 minutes/week); (3) SBBH – Skills Trainer (2700 minutes/week); (4) SBBH – therapeutic recreation program (900 minutes/week); (5) special education (1740 minutes/week); (6) speech/language therapy (150 minutes/week) and; (7) daily transportation.  The supplementary aids offered Student in the May 6, 2004, IEP are: (1) adult supervision; (2) clear, concise, and simplified directions; (3) provide functional tasks; (4) use manipulatives; (5) use reinforces and; (6) verbal and visual instructions.

The parties did not provide evidence of Student's education and service program from Loveland for comparison purposes.  However, as noted throughout Jennifer Garvey's testimony, there was a significant effort to establish similar PLEPs, objectives, and goals for Student between Salt Lake's and Loveland's staffs.  Ms. Garvey described Loveland's staff as "very involved" in the process.  Administrative Hearing Transcript at 22:9.  Ms. Garvey also testified that the classroom at Loveland was set up "somewhat similar" to hers and that she could equitably educate Student at Salt Lake.  Id. at 36.  Ms.

34

Garvey also stated that the home school had established a seizure protocol and created a child-proof classroom for Student.  Id. at 51:8-13.  Finally, addressing another of Plaintiffs' concerns, Ms. Garvey explained that her classroom used Picture Exchange Communication techniques to educate students.  Id. at 17:11.

In addition to Student's services and supplementary aids remaining consistent, other aspects of her education will retain continuity.  Student is currently one of six students in a class; in her placement at the home school Student will be one of five.  See Administrative Hearing Transcript at 342:23, 60:16. Student will continue to be placed with students with similar disabilities, will continue to be taught by a special education teacher, and will retain one-on-one instructional support.  Id. at 18, 15, 60.

The Hearing Officer also noted that a placement in the home school benefits the Student by providing her with an opportunity to interact with her non-disabled peers as regular education students would be visiting her classroom.  See Administrative Decision at 11.  This benefit is consistent with the objective of placing students in the least restrictive environment ("LRE").  The IDEA requires that "to the maximum extent appropriate" a child with a disability should be educated in a LRE.  20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.550.  However, "the IDEA's preference for mainstreaming is not an absolute

commandment." <u>Poolaw v. Bishop</u>, 67 F.3d 830, 836 (9th Cir. 1995).  While efforts should be made to place a student in the LRE, the LRE must also conform to the student's IEP.  <u>County of San Diego v. Cal. Special Educ. Hearing Office</u>, 93 F.3d 1458, 1468 (9th Cir. 1996).  The court should evaluate and balance the following factors to determine whether mainstreaming is appropriate: "(1) the educational benefits of full-time placement in the regular classroom; (2) the non-academic benefits of such placement; (3) the effect the disabled child has on the teacher and children in the regular class; and (4) the costs of mainstreaming the child." <u>Sacramento City Unified Sch. Dist. v. Rachel H.</u>, 14 F.3d 1398, 1404 (9th Cir. 1994).

In this case, the DOE is not mainstreaming Student by placing her in a regular class, but rather placing her in a classroom designed for special education students where she will continue to receive one-on-one instruction.  Contrary to Plaintiffs' argument, the Hearing Officer did not approve of the DOE's plan simply because the home school was the LRE.  Instead, the benefit of providing an opportunity to socialize with regular education students is just one additional factor that further supports his final decision that Salt Lake is an appropriate placement.

For the foregoing reasons, the Court holds that the placement offered Student on May 18, 2004 is consistent with the

36

<u>Capistrano</u> requirements of what constitutes an appropriate education.  59 U.S. at 893.  Thus, the DOE did not violate the substantive requirements of the IDEA in this regard.  The Hearing Officer noted, and this Court reiterates, that Plaintiffs' reluctance to leave a comfortable, familiar and successful environment is understandable.  However, as stated above and by the Hearing Officer, the issue is only whether the school district offered Student a FAPE at the home school.  <u>See</u> Administrative Decision at 8.

**B.    Transition Plan Developed for Student is Adequate**

         Additionally, Plaintiffs assert that an adequate transition plan to move Student from the current school to the home school was not developed.  On May 12, 2003, Dr. Koven composed a detailed transition plan for Student.  <u>See</u> Plaintiffs' Exhibits at 32.13.  Dr. Koven testified that although she did not recommend that Student be transferred from the current school to the home school at the present time, she believed that at some point, Student could transfer "with a really good transition plan."  <u>See</u> Administrative Hearing Transcript at 449:20-22.

         Dr. Koven's plan suggested a number of steps to implement in Student's transition.  Dr. Koven's recommended steps include the following: (1) educational and mental health specialists from the current school meet with home school staff to review safety and educational concerns and make sure the home

37

school environment is prepared and safe for Student; (2) staffs
from the current and home schools set up a transition time line;
(3) current school organizes training for home school teachers
and staff that is specific to Student's autism and related health
concerns; (4) home school staff receives CPR and seizure
training; and (5) Student attends home school program for two
hours each day, increased to three full days per week, before
transferring completely from the current school.  See Plaintiffs'
Exhibits at 32.13.

The DOE's proposed transition plan was drafted by Ms.
Garvey and Louise Funasaki, an autism resource teacher.  Ms.
Garvey testified that before meeting with Ms. Funasaki she
"looked at Dr. Koven's transition plan . . . and created . . . a
framework to discuss transition with the [IEP] team."  See
Administrative Hearing Transcript at 46:23-25, 47:1-3.  However,
Ms. Garvey and Ms. Funasaki did not have Dr. Koven's
recommendations in front of them when they drafted Student's
transition plan.  Id. at 81:11-13.

The transition plan was presented at Student's IEP May
6, 2004 meeting, but Dr. Koven was not in attendance.  See
Defendant's Exhibits at 11.  Dr. Patricia Dukes testified that
her staff who attended the IEP meeting at issue "didn't know
anything about the transition plan until it came later on with
other DOE documentation."  Id. at 295:6-11.  However, Ms. Garvey

testified that among DOE personnel and the staffs from the
current and home schools "there was consensus of agreement with
the plans." Id. at 52:1-3.

Student received the finalized transition plan on July
19, 2004, that differed substantially from the transition plan
recommended by Dr. Koven.  Phase I of the transition was
scheduled to begin the week of August 16, 2004.  See Defendant's
Exhibits at 136.  Student was to attend the home school from 8:00
a.m. until 12:00 noon, and the current school from 12:30 p.m.
until 5:00 p.m..  Id.  The transition plan time line proposes
that Phase I continue until Student is comfortable in the home
school classroom.  Id. at 134.  Ms. Garvey testified that the IEP
team would have to convene and agree that it was appropriate for
Student to transition into Phase II before Student would move
into Phase II.  See Administrative Hearing Transcript at 71:22-
23.  As written, the transition plan schedule states that Student
will begin to attend the home school for a larger part of each
day on September 13, 2004.  See Defendant's Exhibits at 136.
Additionally, Ms. Garvey testified that Student would move back
to the prior phase should a crisis occur, that a seizure protocol
was organized for Student, and that a familiar staff member would
be with Student during Phase I of the transition.  See
Administrative Hearing Transcript at 51.

The IDEA requires that transition services be implemented for students in a number of circumstances. "[A] coordinated set of activities" that is "based upon the individual student's needs" is required when a student transitions from "school to post-school activities . . . post-secondary education, vocational training, integrated employment . . . continuing adult education, adult services, independent living, or community participation." 20 U.S.C. § 1401(30) (2004). While the IDEA requires an IEP to have a statement of needed transition services in some circumstances, the statutory provision of the IDEA specifically addressing transition services does not mandate such services when a transition from private to public school takes place. See e.g., Bock v. Santa Cruz City Schools, No. 95-20168 U.S. Dist. 1996 WL 539715 at *5 (N.D. Cal. 1996).

While no transition plan is required by the IDEA, it is evident from the testimony of various individuals and from the IEP that a transition plan is desirable in order to minimize Student's educational regression and to stabilize Student emotionally. See Plaintiffs' Exhibits at 32.13, Administrative Hearing Transcript at 50-51, 297-306. Although Dr. Koven's recommendations were considered when the transition plan was drafted, Grandmother remained dissatisfied with the transition plan. See Administrative Hearing Transcript at 46:24-25, Defendant's Exhibits at 11. The Court reiterates that when a

consensus can not be reached with regard to a student's IEP, "the [DOE] has the duty to formulate the [IEP] to the best of its ability in accordance with information developed at the prior IEP meetings." <u>Maher</u>, 793 F.2d at 1490.

When a consensus is not reached with regard to a student's IEP, the parent must be afforded a due process hearing to discuss the IEP. <u>Maher</u>, 793 F.2d at 1490.  In this case, Grandmother exercised her right and a Hearing Officer made conclusions based on the facts now before this Court.  With regard to the transition plan, the Hearing Officer stated: "[t]he DOE's 4 step transition plan appears to be appropriate as it calls for Student to become familiar with the home school . . . [has] Student spend progressively longer times at the home school, while keeping contact with the current placement . . . [and] allows for longer stays at the current placement if needed by Student." <u>See</u> Administrative Decision at 9.  The Hearing Officer emphasized that "transition is a concern for Student . . . a change in [Student's] placement may lead to regression . . . it is critical that the DOE use its best efforts to transition this Student to the home school." <u>Id.</u>

"[T]he district court, must give deference to the state hearing officer's findings, particularly when, as here, they are thorough and careful." <u>Seattle School Dist., No. 1 v. B.S.</u>, 82 F.3d 1493, 1499 (9th Cir. 1996).  Accordingly, the Court is

satisfied that the Hearing Officer made a thorough and careful
review of the proposed transition plan before reaching his
conclusion that it would adequately serve Student's needs.
Furthermore, as the Hearing Officer stated, "the DOE is
requesting that it be given a tremendous responsibility of
educating this Student . . . [and] if, after a reasonable time,
it becomes apparent that the home school has not been providing
Student with meaningful education gains, [Plaintiffs] are free to
again request a due process hearing."  <u>See</u> Administrative
Decision at 9-10.

**C.   Salt Lake Elementary is an Appropriate Placement**

      Plaintiffs request this Court to rule that Student's
placement at the current school is appropriate.  <u>See</u> Opening
Brief at 33.  Plaintiffs make their request because they believe
that the DOE's offer of a FAPE is invalid and want Student to
remain at Loveland.  <u>See</u> Opening Brief at 32.  Plaintiffs'
request appears to be for the purpose of securing prospective
reimbursement for Grandmother in the event that this Court
decides the DOE's offer of a FAPE is invalid.  <u>Id.</u>

      Grandmother is not required to accept the DOE's offer
of a FAPE.  Parents who disagree with an offered IEP may
unilaterally place their child in an alternate program.  However,
parents only have a right to equitable reimbursement when their
preferred placement is appropriate and when the school district

42

has failed to offer student a FAPE.  <u>Target Range</u>, 960 F.2d at 1485.  The Court holds that the DOE has made a valid offer of a FAPE at the home school, thus the Court does not find it appropriate to grant Grandmother relief to educate Student in another environment.  20 U.S.C. § 1415(i)(2)(B)(iii).  Having concluded that Salt Lake Elementary is an appropriate placement for Student, the Court need not determine whether Loveland is also an appropriate placement.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, the Court AFFIRMS in part and REMANDS in part the Hearing Officer's Administrative Decision.  The Court finds that the DOE complied with the majority of the procedural requirements of the IDEA by involving Student's guardian, considering evaluations of persons knowledgeable about Student, and providing proper Prior Written Notice.  The Court concludes that the DOE offered a FAPE to Student at the home school and provided an adequate transition plan.  The Court holds that the home school is an appropriate placement for Student.

The Court REMANDS to the Hearing Officer with instructions to determine whether the DOE violated the "stay put" provision of the IDEA.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 4, 2006.



_____
Alan C. Kay
Sr. United States District Judge

L.M., et al., v. DEPARTMENT OF EDUCATION, STATE OF HAWAII, CIV.
NO. 05-00345 ACK/KSC, ORDER AFFIRMING IN PART AND REMANDING IN
PART THE HEARING OFFICER'S ADMINISTRATIVE DECISION.